[Civ. No. 4630.   Fourth Dist.   May 13, 1953.]

ALMA INVESTMENT COMPANY (a Corporation) et al., Respondents, v. E. J. KRAUSSE et al., Appellants.

H. J. March, H. F. Clary, A. E. Stebbings, Conron, Heard & James and Wayne M. Hamilton for Appellants.

West, Vizzard, Howden & Baker for Respondents.

BARNARD, P. J.—This is an action to quiet title. Fifteen of the 31 defendants appeal from a judgment quieting the plaintiffs' title to "a 98% interest in the mining rights in, and all the oil, gas and other hydrocarbon substances under" a certain 40 acres of land in Kern County.

This land was acquired in 1936 by William J. Williams and Bertha Williams, his wife, as joint tenants. They

conveyed oil and gas rights to a number of persons, these conveyances covering in the usual language an undivided fractional interest in "all oil, gas and other hydrocarbons in or under" this land. In January, 1939, the Williamses conveyed the surface rights in this property, together with 2 per cent of the oil and gas rights, to T. A. Putnam and Carrie Putnam, his wife, as joint tenants, reserving to themselves and their assignees 98 per cent of such oil and gas rights. Mr. Putnam later died, and Mrs. Putnam became the owner of and still owns the surface rights and 2 per cent of the oil and gas rights in this land. Mr. Williams died in 1939, and Mrs. Williams became the owner of such part of the 98 per cent of oil and gas rights as had not theretofore been transferred to others. Thereafter, she made further transfers of such fractional interests in the oil and gas rights. Finally, on April 22, 1941, she quitclaimed all her remaining interest in such oil and gas rights to her son Billie N. Williams. In May, 1941, Billie N. Williams conveyed all his interest in said oil and gas rights to various persons, these conveyances being recorded during that month. None of the various deeds conveying oil and gas royalty interests to the defendants contained any such words as "mine", "mining" or "mining rights."

Prior to March, 1939, this land, without any severance of oil or mineral rights, was assessed to Mr. Williams and all such taxes were paid. In March of 1939, 1940 and 1941, the whole property, without any severance, was assessed to Mr. Putnam, and these taxes were paid. In March, 1942, the assessor made a severance assessing the land "exclusive of 98 percent interest mining rights" to Mr. Putnam, and assessed "98 percent interest mining rights" in this land to Billie N. Williams, on which separate interest a tax of $2.02 was levied. A tax statement was mailed to Billie N. Williams in care of his father, who was dead. None of the owners of the 98 per cent interest in the oil and gas rights received any notice of the severance or of the tax on the severed interest, and that tax was not paid. A similar condition continued through and including the year 1950, the severed interest being assessed to Billie, tax statements being mailed to him, no tax being paid, and the owners of the severed interest receiving no notice.

By a deed dated June 30, 1948, and recorded July 14, 1948, the tax collector conveyed the severed interest to the State of California, the description in this deed reading "98 per cent interest mining rights" followed by a description of

this land. By a deed dated March 3, 1950, and recorded March 17, 1950, the tax collector conveyed the severed interest to these plaintiffs, the description in the deed being the same as that in the deed to the state but followed by the words "last assessee Billie N. Williams." None of these defendants, who owned various percentage interests in these oil and gas rights, had received any notice that the "98 per cent interest mining rights" or any other interest had been severed from the fee title and separately assessed, or had been sold to the state or to these plaintiffs, until they were served with the complaint and summons in this action. The land involved is improved with a residence and outbuildings, and has been farmed during all of the period here in question. The Williamses and the Putnams or their lessees have been in undisturbed occupancy and possession of the land continuously since May, 1936. In June, 1936, the Williamses had leased the land for the purpose of prospecting for and producing oil and gas to one Anderson. There was no production of oil or gas, and no exploration or drilling for oil or gas on the property during the period in question. In 1942, the right which had been given to Anderson to prospect for oil was surrendered by quitclaim deed.

This action was brought on April 13, 1951. The complaint alleged that the plaintiffs are the owners of and sought to quiet their title to "a 98% interest in the mining rights in *and all the oil, gas and other hydrocarbon substances under*" this land. (Italics ours.) The plaintiffs, over objection, entered in evidence the deed to the state and the deed to the plaintiffs above described, and rested. The defendants moved for a nonsuit contending that the complaint sought to quiet title to an interest in real property not conveyed by these deeds, being "all the oil, gas and other hydrocarbon substances under" this land. The court took this motion under submission and continued to hear evidence. When the defendants began to introduce evidence of their title and of irregularities in the various tax proceedings, an objection was made that all such evidence was barred by sections 175, 3522 and 3726 of the Revenue and Taxation Code. The court took this objection under submission and continued to hear evidence.

The defendants then introduced evidence tending to show that the phrase "mining rights" cannot be reasonably interpreted to include rights to the proceeds of oil and gas; that if that phrase is so interpreted as to include such rights it would be indefinite and misleading under the custom of

conveyancing and common usage in that county; that the defendants were in actual possession of their interest in improved and cultivated land by and through the possession of their cotenants, which possession had never been disturbed; that no notice had ever been given to the defendant, prior to the commencement of this action, of such severance in assessment; and that various irregularities existed in the tax proceedings in that proper notices had not been given, that no attempt had been made to assess the severed interest to the owners of that interest whose conveyances were recorded, and the severed interest was assessed to a person who was not the last assessee and had no claim or interest in the land. The court then denied the motion for a nonsuit; granted a motion to strike all of the evidence produced by the defendants; found that the plaintiffs are the owners of "A 98% interest in the mining rights in, and all the oil, gas and other hydrocarbon substances under" this land; and found as a conclusion of law that any defense to the action based upon any invalidity or irregularity of any proceeding leading to the execution of the deed to the state, or leading to the execution of the deed from the state to the plaintiffs, is barred by the provisions of sections 175, 3522 and 3726 of the Revenue and Taxation Code. Judgment was entered accordingly, from which this appeal was taken.

These sections of the Revenue and Taxation Code have the general effect of limiting the time in which a defense to a tax deed may be maintained to one year. Sections 3521 and 3725 place a corresponding limitation on the time within which an action attacking the validity of such deeds may be brought. There is a real question, however, as to whether these statutes may be held applicable under some circumstances. In *Tannhauser* v. *Adams,* 31 Cal.2d 169 [187 P.2d 716, 5 A.L.R.2d 1015], involving the question as to whether section 3521 was applicable, the court discussed cases in other states holding that such limitation statutes were inapplicable to one in possession and quoted with seeming approval from a New York case as follows:

"'It is questionable whether, as to an owner in actual possession of land, the record of a hostile conveyance in the clerk's office is sufficient to set a statute of limitations running against him so as to destroy his title.'"

In *McCaslin* v. *Hamblen,* 37 Cal.2d 196 [231 P.2d 1], in considering section 175, the court suggested that this rule might have application where the plaintiff is "the original tax delinquent owner in undisturbed possession," but should not

be applied in favor of such an owner's grantee who took conveyance with knowledge of the intervening rights of a third party. This holding was followed in *McKenna* v. *Ping,* 105 Cal.App.2d 752 [234 P.2d 246]. Other circumstances may be imagined where the applicability of these statutes might well be questioned.

An unusual and obviously unjust situation here appears. For years after many small royalty interests in this land had been conveyed to others and recorded, the property as a whole was taxed to the fee owner and the taxes fully paid. The assessor for years had ignored these conveyances. When he finally decided to segregate and separately assess some sort of interest in this land, he arbitrarily taxed 98 per cent of such interest to one who then owned no interest of any kind and who had never owned more than a small part of the interest thus separately assessed. All notices were sent to that person who was away in the army for four years, and thereafter were sent to him at a wrong address although his correct address was known. The defendants, who owned an interest in the land, would naturally be deceived and believe that the taxes were being paid as before. They were left in complete ignorance until this suit was brought, the plaintiffs having received a final tax deed and then waited until a year had expired. The defendants thus lost their interest in this land, a type of interest which is substantial and of importance throughout the whole state and nation, without any actual notice that any such tax had been levied, or that the method of assessment under which all taxes had been previously levied and paid, had been changed. This startling result follows from the court's liberal interpretation of the language of the assessment and tax deeds, and strict interpretation of the limitation statutes, with the result of shutting out any possible defense however good in itself. It may well be doubted that these statutes were ever intended to be applicable to such a situation, and it would seem that the courts should be able to find some way to avoid such a result.

A real doubt existed as to whether the assessment here relied on was sufficient to affect the particular interests which the defendants owned. In *Jacoby* v. *Wolff,* 198 Cal. 667 [247 P. 195], the court said, quoting from a New York case:

" 'An assessment of land is fatally defective and void, if it contain such a falsity in the designation or description of the parcel assessed, as might probably mislead the owner and prevent him from ascertaining by the notices that his land

was to be sold or redeemed. Such mistake or falsity defeats one of the obvious and just purposes of the statute—that of giving to the owner an opportunity of preventing the sale by paying the tax.' ''

The description of these interests as ''mining rights'' in the assessment and deeds appears to be uncertain, indefinite and misleading under the circumstances. Apparently, the plaintiffs recognized this as they sought in this action to have that meaning clarified and extended by judicial interpretation. It would seem that when an interest in real property is segregated and separately assessed for the first time, it should be sufficiently described so that the owner thereof would know that his interest was being assessed without having to wait for a final decision by the highest court. Webster's New International Dictionary does not contain a definition of the various ''mining rights,'' but defines ''mine'' and ''mining'' as working in a mine or digging metals, coal or precious stones out of the earth. Black's Law Dictionary defines ''mining'' as the process or business of extracting from the earth the precious or valuable metals either in their native states or in their ores. It was held in *In re Rollins Gold & Silver Min. Co.,* 102 F. 982, that the term ''mining'' as ordinarily used does not include the sinking of wells or shafts for oil or gas, unless expressly so declared by statute. In *Cornwell* v. *Buck & Stoddard, Inc.,* 28 Cal.App.2d 333 [82 P.2d 516], after discussing the meaning of ''mining purposes,'' the conclusion was expressed that while oil is classified as a mineral the process of extracting it from the ground is not generally understood to mean ''mining,'' and it was held that the phrase ''mining purposes'' as used in section 2980 of the Civil Code did not include oil wells or oil drilling operations. While this section was later amended, for obvious reasons not material here, the reasoning of that case is applicable here, and we have no statute in this state declaring or indicating that ''mining rights'' is to be interpreted as including ordinary oil rights. In *Smith* v. *Cooley,* 65 Cal. 46 [2 P. 880], a mining right is defined as a right to enter upon land and work the ground for the purpose of obtaining minerals or ores which may be found therein. This idea of mining rights has long prevailed and is what would be understood by people in general when such rights are referred to. Even if any oil rights were thought of by the ordinary person, in connection with the term ''mining rights,'' the right of a

lessee to enter the land and drill for oil would naturally be understood, rather than the right to share in the proceeds of oil after it is produced. ■ This latter right is a profit *a prendre* (*Callahan* v. *Martin*, 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871]), and while it is an interest in land, it is one which is separate and distinct from the right to drill involved in an oil lease. ■ If any separate mining right here existed it would seem to have been the limited right given to Anderson to drill for oil on this land. Not only was there a real question as to the meaning of the language used in the assessment and tax deeds, and as to whether the interests owned by the defendants were covered thereby, but that question should be determined in the light of common usage and the way that language would be understood by people in general throughout the whole state, and not because a different understanding may possibly have prevailed in limited circles in Kern County. These defendants resided in various parts of the state, and purchasers and owners of such interests in land are more apt than not to be scattered over the whole state and elsewhere. If defendants' interest in this land was not sufficiently described, taxed and sold these statutes would not apply, and it seems unthinkable that they should be held to be so applicable as to prevent an owner from even presenting a defense on the ground that his property had not been assessed or sold.

Even if it be assumed that the language used in this assessment and followed in the tax deeds was not, in itself, so indefinite as to be misleading, the making of the segregation for the first time in this manner would naturally be deceptive. All interests in this land were assessed together for years and the taxes fully paid. While there were prospective rights to share in any oil produced, no oil had been produced and no wells had been drilled. These prospective rights were of little present value, as shown by the amount of the assessment, and the owners of those rights would naturally rely on a continuance of the usual and customary assessment and payment of taxes; until a different situation was brought to their attention. Section 2803 of the Revenue and Taxation Code provides for the segregation of certain interests in land after the assessment has been made, at the request of the owner of such an interest, but requires the presentation of record evidence of such ownership. The assessor may have the right to segregate and separately assess such an interest as that owned by the defendants, if such a separate interest appears

of record, but it should inevitably follow that he should be required to assess it, especially for the first time, to the persons owning such interest as shown by the record, or give them notice in some way, so that such owners would have an opportunity to pay the segregated taxes and protect themselves. Section 611 provides that in the case of real property it shall be assessed in the name of an absent owner, if that name appears of record in the office of the county recorder. The defendants were such absent owners, owning an interest in real property, and their conveyances were on record. This statute was not followed and the making of such a new assessment for the first time, which was in no way brought to the attention of the owners of the interests thus separately assessed, might well result, in a very real sense, in depriving these owners of their property without due process of law. The statutes here in question were doubtless intended to cover the ordinary case where land is assessed in the usual manner, and the subsequent proceedings are outlined in the pertinent statutes. It may be seriously questioned whether they were intended to, or should be held to, have application to such an assessment as that here in question, the procedure for which is not too well outlined in the statutes, unless there appears a full and complete compliance with the usual and ordinary rules governing the notice required by due process.

A further question with respect to the application of these statutes appears in connection with the matter of possession. In the Tannhauser and McCaslin cases, above referred to, it was strongly implied that such statutes should not be held applicable to a ''tax delinquent owner'' who was in undisturbed possession of the land. In *McKenna* v. *Ping, supra,* it was said:

''It appears to be a general rule that a limitation statute, with respect to an action to quiet title, does not run against one in possession of land, and a person in possession of land cannot be required under penalty of forfeiture to bring an action against one claiming an adverse interest or title to such property.''

Each of these percentage interests in the oil and gas was an interest in the land, and each of the defendants was an owner of one of these interests. Mrs. Putnam, who owned the fee, also owned such an interest. She and the defendants were cotenants with respect to this interest in the land. She was at all times in actual possession of the land itself, which physically contained any oil or gas that might be involved

in the interest held by her cotenants. She was in actual possession with respect to the right attempted to be separately assessed, so far as anyone could be, until oil is actually removed and becomes personal property and thus subject to a different form of assessment. Being one of the cotenants with respect to this interest in the land, her possession should under familiar rules be deemed the possession of all of them. The defendants are the ''original tax delinquent owners'' and they should be held to be in possession of the property, within the meaning of the suggested rule, and as against the plaintiffs who had no actual possession of any kind.

Whether or not it should eventually be held that these statutes are not applicable to an original tax delinquent owner in possession, so as to prevent him from defending against a tax title held by one not in possession, it must be held that they are not so applicable as to prevent the owner of an interest in the land from raising the defense that the assessment as made, and the sale based thereon, was of some other interest and did not cover or affect his particular interest. At most, these statutes create a time limitation on the right of presenting a defense based upon the invalidity of the tax proceedings. They do not purport to make any such limitation on the right of an owner to make a defense based on the contention that the proceedings, even if valid, did not apply to or affect the land or interest in land which he owns. The appellants were entitled to make such a defense here and were not barred by these statutes from so doing. Questions of fact were presented which should have been determined, and it was error to strike out all the evidence introduced and offered except the two tax deeds.

The judgment is reversed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied June 9, 1953, and respondents' petition for a hearing by the Supreme Court was denied July 9, 1953. Carter, J., was of the opinion that the petition should be granted.