[L. A. No. 29534. In Bank. Nov. 18, 1968.]

ATLANTIC OIL COMPANY et al., Plaintiffs and Appellants, v. COUNTY OF LOS ANGELES et al., Defendants and Appellants.

HUMBLE OIL & REFINING COMPANY et al., Plaintiffs and Appellants, v. CITY OF LONG BEACH, Defendant and Appellant.

(Consolidated Cases.)

[L. A. No. 29535. In Bank. Nov. 18, 1968.]

HAMMIL OIL CORPORATION et al., Plaintiffs and Appellants, v. COUNTY OF ORANGE et al., Defendants and Respondents.

586

588

590

Consolidated actions by plaintiff taxpayers to recover taxes allegedly based on improper assessments. That portion of

judgment for defendants in L. A. No. 29534 dealing with assessments of interest under the Standard contract is reversed with directions, in all other respects affirmed; judgment for defendant in L. A. No. 29535 affirmed.

Hanna & Morton, Harold C. Morton, John H. Blake and Edward S. Renwick for Plaintiffs and Appellants.

John D. Maharg, County Counsel (Los Angeles), John D. Cahill, Deputy County Counsel, Leonard Putnam, City Attorney, Kenneth K. Williams, Deputy City Attorney, Hill, Farrere & Burrill, Carl A. Stutsman, Jr., Vincent C. Page, Jack R. White, Keil & Connolly, George A. Connolly, Richard Dole, Adrian Kuyper, County Counsel (Orange), and Robert F. Nuttman, Assistant County Counsel, for Defendants and Appellants and for Defendants and Respondents.

Thomas C. Lynch, Attorney General, Jay L. Shavelson, Assistant Attorney General, and Phillip G. Samovar, Deputy Attorney General, as Amici Curiae in L. A. 29534.

TRAYNOR, C. J.—In these consolidated appeals plaintiff taxpayers seek to recover taxes that they claim were based on improper assessments. Both plaintiffs and defendants in L.A. 29534, appeal from a judgment upholding 46 assessments and invalidating three assessments by the County of Los Angeles and the City of Long Beach for the tax year of 1963-64. The State Lands Commission of the State of California appears as amicus curiae in support of two of those plaintiffs. In L.A. 29535, plaintiffs appeal from a separate judgment upholding 37 assessments by the County of Orange for the tax year 1964-65.

The facts are not in dispute. By virtue of various documents, plaintiff oil operators obtained from tax-exempt governmental entities rights to drill for and extract oil, gas, and other hydrocarbons from specified public lands, together with necessary surface occupancy and access rights. The documents grant such rights for specified periods and are variously denominated leases, orders, permits, agreements, and drilling and operating contracts. Each provides that the governmental entity owning the property is to receive a percentage or fraction of production payable in cash or in kind.

Plaintiffs' rights in the public lands are admittedly subject to ad valorem property taxes as mining rights or mineral

rights. Assessors for defendant cities and counties employ the capitalization of income method of assessing these rights.[1] Before 1963 the County of Los Angeles and the City of Long Beach assessed such rights by estimating the present value of the oil, gas, and other hydrocarbons expected to be recovered over the anticipated duration of each agreement and subtracting therefrom (1) the estimated present value of the anticipated costs of withdrawing those substances and (2) the estimated present value of the sums that each plaintiff would be required to pay the government entity owning the land in money or in kind. The assessed value was derived by multiplying the fair market value by the ratio of assessed values to fair market values prevailing generally throughout the taxing jurisdiction. Before 1964 the Orange County assessor employed a substantially similar method.[2] Each governmental entity then applied the appropriate tax rate to the assessed value to compute the taxes.[3]

After 1963 in Los Angeles County and the City of Long Beach, and after 1964 in Orange County, the assessors no longer excluded value attributable to the portion of production to be paid to governmental entities in calculating the fair market value of plaintiffs' interests. This change in assessment procedures resulted in a large increase in the assessed value of plaintiffs' interests and a corresponding increase in their taxes.[4] After exhausting their administrative remedies,

[1]With the exception of the City of Long Beach, each defendant city has entrusted to the appropriate agencies of defendants Los Angeles County and Orange County the tasks of assessing property for purposes of municipal taxation, equalizing and correcting assessments, and collecting the taxes. The City of Long Beach assesses and collects its own ad valorem taxes.

[2]Before 1964 the Orange County assessor employed a procedure that had the same effect of excluding value attributable to the portion of production to be paid to government entities. He calculated an assessed value per barrel of oil, produced by determining an average weighted price per barrel of oil, subtracting a per barrel cost of production therefrom, and multiplying the result by a capitalization factor adjusted to reflect the ratio of fair market value to assessed value. He then multiplied the resulting assessed value per barrel of oil by the difference between the estimated number of barrels of oil to be produced and the number of barrels equivalent to the value of the payments to the government entity owning the land.

[3]Many of the documents granting oil rights contain tax provisions. Some merely state that plaintiffs are to pay all mineral taxes levied on their interests; others provided for sharing the taxes according to the respective percentages of production to which each party is entitled.

[4]In 1967 the Legislature added sections 107.2 and 107.3 to the Revenue and Taxation Code to define the full cash value of certain leasehold estates in exempt property for the production of gas, petroleum and other

plaintiffs filed actions seeking recovery of taxes resulting from the increased assessments and declaratory relief. In L.A. 29534, the superior court entered judgment in favor of plaintiffs with respect to three assessments of mineral rights granted under documents entitled "drilling and operating contracts," but otherwise sustained the method of valuation employed by the County of Los Angeles assessor and the City of Long Beach assessor. In L.A. 29535, the superior court sustained the method of valuation employed by the Orange County assessor in all cases, including his assessment of rights under a "drilling and operating contract" similar to those in L.A. 29534.

*Leases, Orders, and Permits*

 We first consider the instruments, denominated as leases,[5] orders, or permits.[6] Each conveys to a lessee the exclusive right to drill for and extract oil, gas, and other hydrocarbons from beneath specified publicly owned land, together with necessary surface occupancy and access rights. Some instruments convey those rights for a fixed term, and others for so long as oil and gas are produced in paying quantities. Each instrument entitles the lessor to a percentage or fraction of production, to be taken either in kind or in cash.[7]

The nature of the rights created by such instruments is

---

hydrocarbon substances. (Stats. 1967, ch. 1684, §§ 1, 2.) Chapter 1684 also provided that it should not be construed to affect this litigation. (§ 3.)

[5]Nine of the leases were granted by the United States Department of the Interior. Thirteen were granted by various city and county governments. Fifteen are "community" leases, granted by adjoining owners of relatively small parcels of land, some of whom are governmental entities, who have pooled their interests so that their holdings may be developed jointly. The remainder are oil and gas leases granted by the State of California.

[6]Eight of the instruments are denominated "orders" or "permits" from the Board of Harbor Commissioners of the City of Los Angeles. The trial court noted that "Because of the trusts upon harbor lands imposed by the City Charter, sections 141(6), 142 and 143a, the use of such lands for drilling and production of oil is under a 'permit' rather than a 'lease.' " Since the provisions contained therein are substantially identical with those found in leases, we regard the orders and permits as being in the same category as leases. (Cf. *Dutton* v. *Interstate Inv. Corp.* (1941) 19 Cal.2d 65, 68 [119 P.2d 138]; *Morrow* v. *Coast Land Co.* (1938) 29 Cal.App.2d 92, 110-111 [84 P.2d 301].)

[7]Most of the instruments allow the lessor to choose the form of payment; some require him to take payment in cash. Cash value is based upon the current market price of oil, the best price available, or similar formulae specified in the agreement,

594

settled in California. "[T]he owner of land does not have an absolute title to oil and gas in place as corporeal real property, but, rather, the exclusive right on his premises to drill for oil and gas, and to retain as his property all substances brought to the surface on his land." (*Callahan* v *Martin* (1935) 3 Cal.2d 110, 117 [43 P.2d 788, 101 A.L.R. 871]. See also *La Laguna Ranch Co.* v. *Dodge* (1941) 18 Cal.2d 132, 135 [114 P.2d 351, 135 A.L.R. 546]; *Gerhard* v. *Stephens* (1968) 68 Cal.2d 864, 879-880 [69 Cal.Rptr. 612, 442 P.2d 692].)

Under the instruments herein, each public entity granted the privilege of drilling for and producing oil and gas exclusively to a lessee without reservation or exception for the term of the lease. "The right [to drill for and produce oil] when granted is a profit *a prendre*, a right to remove a part of the substance of the land. ■ A profit *a prendre* is an interest in real property in the nature of an incorporeal hereditament. . . . The profit *a prendre*, whether it is unlimited as to duration or limited to a term of years, is an estate in real property. If it is for a term of years, it is a chattel real, which is nevertheless an estate in real property, although not real property, or real estate. [Citation omitted.] Where it is unlimited in duration, it is a freehold interest, an estate in fee, and real property or real estate." (*Dabney-Johnston Oil Corp.* v. *Walden* (1935) 4 Cal.2d 637, 649 [52 P.2d 237]. See also *Callahan* v. *Martin, supra,* 3 Cal.2d 110, 118; *Gerhard* v. *Stephens, supra,* 68 Cal.2d 864, 879-880.) Each lessor retained a reversionary interest, the right to drill for and produce oil and gas after the period specified in the lease. (*Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, 647.) ■ Each lessor also received the right to specified oil and gas royalty payments, a right that we have classified as an incorporeal hereditament, an interest in land. (See *Callahan* v. *Martin, supra,* 3 Cal.2d 110, 124; *Standard Oil Co.* v. *J. P. Mills Organization* (1935) 3 Cal.2d 128, 134 [43 P.2d 797]; *Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, 647.)

■ It is settled, however, "that for purposes of taxation the definitions of real property in the revenue and taxation laws of the state control whether they conform to definitions used for other purposes or not." (*Trabue Pittman Corp.* v. *County of Los Angeles* (1946) 29 Cal.2d 385, 393 [175 P.2d 512]; see also *San Diego Trust & Sav. Bank* v. *County of San*

*Diego* (1940) 16 Cal.2d 142, 147 [105 P.2d 94, 133 A.L.R. 416].) Section 104 of the Revenue and Taxation Code provides that " 'Real estate' or 'real property' includes: (a) The possession of, claim to, ownership of, or right to the possession of land. (b) All mines, minerals, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto. . . ."[8] Plaintiffs' rights in the public lands are admittedly subject to ad valorem property taxes as "mining rights" or "mineral rights" (Rev. & Tax. Code, §§ 201, 104, 607.5), and it is those interests that defendants claim they assessed. Plaintiffs contend, however, that the lessors' interests in land resulting from the rights to royalties are classified as real property by state tax laws, and that such interests are therefore part of the bundle of rights that constitutes the hydrocarbon mineral estate for ad valorem tax purposes. Accordingly, they conclude that failure to deduct the present value of royalty payments in computing the value of their interests results in taxation to them of rights owned by tax exempt lessors.

■ Although it is classified under general concepts of property law as an incorporeal hereditament and an interest in land, we conclude that the right to receive royalties is not classified as real property for purposes of taxation. ■ Section 104 of the Revenue and Taxation Code defines real property to include "all . . . minerals . . . in the land, . . . and all rights and privileges appertaining thereto." As noted above, in California the right to receive royalties is not a right appertaining to minerals "in the land." Rather, it is an interest in oil and gas when they are removed from the land and reduced to possession. The purpose of the qualifying phrase "in the land" is to differentiate such royalty interests in extracted minerals from interests in minerals still in the land.[9] Only the latter, which include the right to drill for and

[8]Section 2500.17 of the Long Beach Municipal Code contains almost identical language.

[9]Plaintiffs cite *Sheffield* v. *Hogg* (1934) 124 Tex. 290, 310 [77 S.W.2d 1021, 1030] as an example of a contrary construction of an almost identical statute. Texas courts, however, have adopted the doctrine of title to oil and gas in place, under which the royalty holder owns his percentage share of oil and gas in the ground. (See, e.g., *Texas Co.* v. *Daugherty* (1915) 107 Tex. 226 [176 S.W. 717, L.R.A. 1917F 989]; *Sheffield* v. *Hogg, supra,* 124 Tex. 290, 298.) An interpretation based on that theory is no authority in California, which has rejected the doctrine of title to oil and gas in place. (See, e.g., *Callahan* v. *Martin, supra,* 3 Cal.2d 110, 116-117; *Gerhard* v. *Stephens, supra,* 68 Cal.2d 864, 878.)

extract oil and gas from the land, are real property for tax purposes.[10]

The history of section 607.5 of the Revenue and Taxation Code also indicates that the Legislature did not include the right to share in the proceeds of oil and gas after they are produced as one of the rights and privileges appertaining to minerals in the land. Section 607.5 provides: "In the event that a separate assessment of rights and privileges appertaining to mines or minerals and land is made, the descriptive words 'mining rights' or 'mineral rights' on the assessment role shall include the right to enter in or upon the land for the exploration, development, and production of minerals, including oil, gas, and other hydrocarbons." On its face, the statute does not restrict the meaning of "rights and privileges appertaining to mines or minerals and land" to the right to enter and produce oil, gas and other hydrocarbons, for the "term 'includes' is ordinarily a word of enlargement and not of limitation." (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639 [268 P.2d 723].) Section 607.5 was enacted in 1955, however, apparently in response to two decisions by the Fourth District Court of Appeal. In 1953 that court held that the term "mining rights" was too vague to include oil rights of any kind, and further stated that "Even if any oil rights were thought of by the ordinary person, in connection with the term 'mining rights,' the right of a lessee to enter the land and drill for oil would naturally be understood, rather

---

[10]Before the early 1940's, many county assessors separately assessed royalty rights to oil and gas lessors, thereby implicity classifying such rights as real property under section 3617 of the Political Code, the predecessor of section 104 of the Revenue and Taxation Code. Plaintiffs contend that the Legislature adopted this interpretation of the statute by frequently reenacting the relevant language in section 3617 without significant modification during that period. (See, e.g., Stats. 1905, ch. 199, § 1, p. 192; Stats. 1909, ch. 609, § 1, p. 919; Stats. 1921, ch. 177, § 1, p. 185; Stats. 1925, ch. 12, § 1, p. 11; Stats. 1929, ch. 54, § 1, p. 124.) During that period, however, the cases were in conflict, the character of rights to subsurface oil was unclear and assessors could therefore reasonably treat the lessor as the owner of his share of the oil and gas in the ground. (See, e.g., *Graciosa Oil Co.* v. *County of Santa Barbara* (1909) 155 Cal. 140, 145-146 [99 P. 483, 20 L.R.A. N.S. 211]; *Associated Oil Co.* v. *County of Orange* (1935) 4 Cal.App.2d 5, 6 [40 P.2d 887].) The doctrine of title to oil and gas in place was not definitively rejected in California until 1935 (see *Callahan* v. *Martin, supra,* 3 Cal.2d 110, 116-117), and the Legislature last considered section 104 in 1939, after a series of decisions by this court further defining and delineating rights to sub-surface oil and gas. Under the circumstances, we cannot assume that the Legislature adopted administrative interpretations of section 3617 that may have reflected no more than uncertainty as to the nature of oil and gas rights.

than the right to share in the proceeds of oil after it is produced." (*Alma Inv. Co.* v. *Krausse* (1953) 117 Cal.App.2d 740, 745-746 [256 P.2d 1017].) In 1954 the court again held that the term "mining rights" did not necessarily include "ordinary oil rights." (*Estribou* v. *Alma Inv. Co.* (1954) 126 Cal.App.2d 61, 64 [271 P.2d 176].) Section 607.5 modifies the holdings of these cases. Had the Legislature deemed that both nonoperating royalty interests and rights to enter land and produce oil and gas are taxable mineral estates, it is reasonable to assume that it would have said so by defining "mining rights" or "mineral rights" to include both types of interests. not just the latter.

Plaintiffs contend, however, that to interpret section 104 to exclude royalty interests is inconsistent with section 107 of the Revenue and Taxation Code.[11] They point out that in specifying the interests in gas, petroleum, and hydrocarbon substances that should be placed on the secured roll, section 107 refers to "incorporeal hereditaments or profits a prendre." They urge that in this context an incorporeal hereditament must be something different from a *profit a prendre* and conclude that the Legislature therefore used the words "incorporeal hereditament" in section 107 to mean a nonoperating royalty interest. ■ Section 107, however, deals with possessory interests, and its purpose is to distinguish between those possessory interests that must be placed on the unsecured roll and such interests that must be placed on the secured roll. Accordingly, since a nonoperating royalty interest is not a possessory interest, it is not an incorporeal hereditament within the meaning of section 107. *Delaney* v. *Lowery*

[11]Section 107 reads in part: " 'Possessory interests' means the following: (a) Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person. (b) Taxable improvements on tax-exempt land. Except as provided in this section, possessory interests shall not be considered as sufficient security for the payment of any taxes. Leasehold estates for the production of gas, petroleum and other hydrocarbon substances from beneath the surface of the earth, and other rights relating to such substances which constitute incorporeal hereditaments or profits a prendre, are sufficient security for the payment of taxes levied thereon. Such estates and rights shall not be classified as possessory interests, but shall be placed on the secured roll." Revenue and Taxation Code section 109 provides in part: " 'Roll' means the entire assessment roll. The 'secured roll' is that part of the roll containing . . . property the taxes on which are a lien on real property sufficient, in the opinion of the assessor, to secure payment of the taxes." Revenue and Taxation Code section 2187 provides: "Every tax on real property is a lien against the property assessed."

(1944) 25 Cal.2d 561 [154 P.2d 674], is not to the contrary, for the court was there concerned solely with the application of section 107 to the interests of operating lessees under oil and gas leases.

■ Plaintiffs contend that the uniform practice of assessors before 1963 of deducting royalties payable to a tax exempt lessor in assessing the value of the lessee's interest constitutes a settled administrative interpretation that royalty interests are rights and privileges appertaining to minerals in the land within the meaning of section 104. Plaintiffs assert that it is only because such interests were held by tax exempt lessors, that assessors in the past did not include their value as part of the total taxable value of the mineral estate. Plaintiffs conclude that we should give controlling weight to this administrative interpretation.

As pointed out above (see fn. 10, *supra*) the assessors' practice of treating royalty interests as taxable real property under section 104 may have arisen out of uncertainty as to the theory of the ownership of oil and gas rights. After that theory was clarified in the 1930's, there was no compelling need for assessors to reconsider their assessment practices until this court's decision in *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 566-570 [290 P.2d 544], disapproving the valuation methods approved in *Blinn Lbr. Co.* v. *County of Los Angeles* (1932) 216 Cal. 468 [14 P.2d 516], and *Blinn Lbr. Co.* v. *County of Los Angeles* (1932) 216 Cal. 474 [14 P.2d 512, 84 A.L.R. 1304]. (See also *Texas Co.* v. *County of Los Angeles* (1959) 52 Cal.2d 55, 59-61 [338 P.2d 440].) In the case of privately owned land, the entire value of the mineral estate is taxable, and liability for the payment of taxes between the lessor and lessee is a subject for agreement between them. Accordingly, it is essentially only a matter of bookkeeping whether the assessor assesses the entire mineral estate to the lessee or lessor or assesses their interests separately. In the case of land owned by tax exempt entities, under the rule of the *Blinn* cases, the value of the royalty interest was deducted in assessing the value of the taxable lessee's interest, and it was therefore immaterial to the assessor whether or not the royalty interest would have been taxable under section 104 had the lessor not been tax exempt. The decision in the *De Luz* case made the question of such taxability material, for royalty interests could no longer be deducted under the valuation rule of the *Blinn* cases and the question therefore arose whether royalty interests should be

deducted as separate interests in real property under section 104. Even if we assume that the failure of assessors to apply the *De Luz* case to oil and gas leases for eight years after it was decided was not the result of inertia, but constituted an administrative interpretation that royalty interests are taxable under section 104 unless they are held by a tax exempt entity, that interpretation would not be binding. ■ "[A]lthough contemporaneous construction by officials charged with the administration of a statute or ordinance is given great weight, 'final responsibility for the interpretation of the law rests with the courts. "At most administrative practice is a weight in the scale, to be considered but not to be inevitably followed." ' (*Whitcomb Hotel* v. *California Emp. Com.*, 24 Cal.2d 753, 756-757 [151 P.2d 233, 155 A.L.R. 405], quoting from *F. W. Woolworth Co.* v. *United States*, 91 F.2d 973.) ■ The rule of contemporaneous construction may not be applied when the wording of the statute or ordinance, as in the present case, clearly calls for a different construction. (*California Drive-in Restaurant Assn.* v. *Clark*, 22 Cal.2d 287, 294 [140 P.2d 657, 147 A.L.R. 1028].)" (*Johnston* v. *Board of Supervisors* (1947) 31 Cal.2d 66, 74-75 [187 P.2d 686]; see also *Goodwill Industries* v. *County of Los Angeles* (1953) 117 Cal.App.2d 19, 26 [254 P.2d 877].)

■ We conclude that a landowner's royalty interest under an oil and gas lease or similar agreement is not real property within the meaning of section 104 and that therefore failure to deduct its value in assessing the interest of a lessee of tax exempt land does not result in imposing a tax on tax exempt property.

■ The remaining issues involve the valuation of plaintiffs' various operating interests. Defendants base their refusal to deduct the present value of future royalty payments in assessing plaintiffs' interests on *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, and *Texas Co.* v. *County of Los Angeles, supra,* 52 Cal.2d 55. Although each of those cases involved a surface lease and the question of the deductibility of the present value of the lessor's right to receive rent in assessing the value of the lessee's possessory interest in tax exempt land, their rationale applies also to the question of the deductibility of the present value of royalty interests in assessing plaintiffs' rights to produce oil and gas under their leases and similar agreements with the owners of tax exempt land.

We recognized in the *De Luz* case that the capitalization of income method is a "generally accepted method of valuing property from which income may be or is derived." (45 Cal.2d 546, 564.)[12] In both the *De Luz* and *Texas Co.* cases we held that in valuing a surface lease by the capitalization of income method, future rents are not to be deducted in arriving at a net income figure. (45 Cal.2d 546, 566; 52 Cal.2d 55, 60-62.) "Taxation of property at its value without regard to the owner's equity therein is an established principle of ad valorem taxation. Thus, a conditional vendee or a mortgagor is taxable at the full value of property as its owner even though he could realize little or nothing by its sale. (*S.R.A., Inc.* v. *Minnesota*, 327 U.S. 558, 569-570 [90 L.Ed. 851, 859-860, 66 S.Ct. 749]; *Eisley* v. *Mohan*, 31 Cal.2d 637, 643 [192 P.2d 5]; *De Luz Homes, Inc.* v. *County of San Diego*, 45 Cal.2d 546, 573 [290 P.2d 544].) The continued enjoyment of the benefits of ownership of the fee or a possessory interest is dependent on discharging the obligations assumed to secure such benefits, and there is no logical basis for treating those obligations differently as they happen to run to a lessor, a conditional vendor, or a mortgagee." (*Texas Co.* v. *County of Los Angeles, supra*, 52 Cal.2d 55, 62.)

The analogy between rents and royalties is well settled. "Rent paid for a leasehold interest . . . is part of the cost or purchase price of the leasehold, . . . " (*De Luz Homes, Inc.* v. *County of San Diego, supra*, 45 Cal.2d 546, 567.) " 'Rent is a compensation paid for the use of land. It need not be money. Any chattels or products of the soil serve the purpose equally as well. . . .' (*Clarke & Caine* v. *Cobb*, 121 Cal. 595, 597 [54 P. 74]; . . .) " (*Silveira* v. *Ohm* (1949) 33 Cal.2d 272, 276 [201 P.2d 387].) Similarly, royalty payments are consideration to the lessor for the uses of land

---

[12] "According to this method, the value of property is the sum of anticipated future installments of net income from the property, less an allowance for interest and the risk of partial or no receipt. . . . The first step in the process is to determine prospective net income and this is done by estimating future gross income and deducting therefrom expected necessary expenses incident to maintenance and operation of the property. . . . Since it is generally accepted that a person who agrees to receive payment in the future is entitled to interest both for waiting and the risk of partial or no receipt, the second step is to discount each future installment of income by a rate of interest that takes into account the hazards of the investment and the accepted concepts of a 'fair return.' The sum of the discounted installments is the present value of the property." (*De Luz Homes, Inc.* v. *County of San Diego, supra*, 45 Cal.2d 546, 564-565.)

allowed by contract. "Under the usual oil and gas lease the owner confers on the lessee for the term of the lease an exclusive right of profit to drill for and produce oil, the lessee usually returning to the lessor for the privilege granted a rent or royalty measured by a fraction of the oil produced." (*Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, 649; see also *Standard Oil Co.* v. *J. P. Mills Organization, supra,* 3 Cal.2d 128, 134-135.) Thus in *Callahan* v. *Martin, supra,* 3 Cal.2d 110, 123, the case in which we rejected the theory of ownership of oil and gas in place, we recognized that "royalty return . . . is rent, or so closely analogous as to partake of the incidents thereof." "The words 'royalty' and 'rent' . . . 'are used interchangeably to convey the same meaning'; i.e., 'the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows' (*Nelson* v. *Republic Iron & Steel Co.* (1917) 240 F. 285, 291, 293 [153 C.C.A. 211]; *Elsinore Oil Co.* v. *Signal Oil etc. Co.* (1935) 3 Cal.App.2d 570, 573 [40 P.2d 523])." (*Denio* v. *City of Huntington Beach* (1943) 22 Cal.2d 580, 596 [140 P.2d 392, 149 A.L.R. 320].) In this respect it is immaterial that the lessor obtains title to royalty oil and gas as soon as it is produced at the wellhead, whereas rental payments are usually made from funds initially owned by the lessee. The owner of land has no title to oil and gas in place but only the exclusive right to produce it from his land. When he conveys that right to a lessee in exchange for the right to receive a fraction of the oil and gas produced, his royalty interest, like the right to receive rent pursuant to other kinds of leases, flows from the agreement of the parties. The fact that the oil and gas would have been the lessor's personal property had there been no lease and had the oil and gas been produced by him does not change the character of his relationship with the lessee or the nature of the royalty payment as compensation for the use of land.[13]

We turn now to certain leases and agreements that differ in various respects from the leases, orders, and permits considered above.

*The Rancho Park Lease of Land Owned by the City of Los Angeles.*

 In 1946 the city assigned to the United States of America "six and one-quarter percent (6¼%) of the amount

---

[13]Plaintiffs also suggest that the right to receive future rents is not analogous to the right to receive future royalties because the latter may

or value of any oil and gas . . . that may be produced from that certain property. . . ." In 1957 the city entered into a 35-year oil and gas lease with Signal Oil and Gas Company and Richfield Oil Corporation as co-lessees. Under its terms the lessees are required to pay the city a 1/5 royalty plus 50 percent of net profits after payout. The lease expressly provides that "the United States of America is the owner of six and one-quarter per cent (6¼%) of the amount or value of any oil and gas that may be produced from the demised property except that used on the demised property, and . . . the royalty of one-fifth (1/5) herein reserved . . . to the Lessor includes such an amount or value."

Plaintiffs contend that any analogy between the royalty payments to the United States and surface rentals of the type involved in the *De Luz* and *Texas Co.* cases is fallacious on the ground that such royalty payments under the lease cannot be classified as part of the purchase price paid by the lessees to the United States. We do not agree with this contention. As a result of the 1946 assignment, which was made before the oil and gas lease was executed, the City of Los Angeles and the United States of America were tenants in common in the exclusive right to drill for and produce oil and gas from the land. (See *Little* v. *Mountain View Dairies, Inc.* (1950) 35 Cal.2d 232, 234 [217 P.2d 416]; *Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, 649.) ██ The United States did not sign the 1957 lease, but a single cotenant may confer occupancy rights upon a third person. (*Lee Chuck* v. *Quan Wo Chong & Co.* (1891) 91 Cal. 593, 598-599 [28 P. 45]; *Verdier* v. *Verdier* (1957) 152 Cal.App.2d 348, 352 [313 P.2d 123].) ██ Furthermore, when one tenant in common makes an oil and gas lease, it binds the other tenants in common who ratify the lease, and acceptance of benefits under the lease constitutes ratification. (*Bessho* v. *General Petroleum Corp.* (1921) 186 Cal. 133, 141 [199 P. 22]; see also *Little* v. *Mountain View Dairies, Inc., supra,* 35 Cal.2d 232, 235.)

be assigned in perpetuity and may therefore survive the oil and gas leases existing at the time of the assignment. When a landowner makes an oil and gas lease and then assigns in perpetuity his right to receive royalty payments, he conveys his right to receive royalty payments for the period of the lease and also part of his reversionary interest in the *profit a prendre.* (*Callahan* v. *Martin, supra,* 3 Cal.2d 110, 124; *Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, 649; *Schiffman* v. *Richfield Oil Co.* (1937) 8 Cal.2d 211, 223 [64 P.2d 1081]; *La Laguna Ranch Co.* v. *Dodge, supra,* 18 Cal.2d 132, 136.) A landowner who has the right to receive rents from a surface lease may also assign both his right to receive rent and his reversionary interest.

 Plaintiffs are therefore obligated to make royalty payments to co-lessors instead of to a single lessor; their obligation to pay a 6¼ percent royalty to the United States constitutes part of the consideration for their right to produce oil and gas from the land.

## The Compensatory Royalty Agreement

 The State of California owns land adjacent to privately owned land upon which the Hancock Oil Company had an oil and gas lease. Under the terms of the compensatory royalty agreement, the state promised that it would not drill, or permit others to drill, any well for the production of oil and gas on its land; in return, Hancock agreed to pay the state 1.448 percent of all oil produced and sold from wells drilled under its lease on the adjoining privately owned land. The state also granted Hancock an easement and rights of way on the state-owned land, exercisable at any time for any of Hancock's operations under its lease on the adjoining privately owned land.

Plaintiff Signal Oil and Gas Corporation, the successor in interest to Hancock, contends that any analogy between the royalty payments to the state and surface rentals of the type involved in the *De Luz* and *Texas Co.* cases is fallacious on the ground that payments under the compensatory royalty agreement cannot be classified as part of the purchase price for the right to produce oil and gas from privately owned land. Under the compensatory royalty agreement, however, Signal obtained interests in the state-owned land—the right to exclude others from drilling any well for the production of oil and gas on that land, and an easement and rights of way over the land. The royalty payments are compensation for those interests in land, and as such are analogous to rental payments under the *De Luz* rule.

## Drilling and Operating Contracts

In L.A. 29534, the trial court held invalid the assessments of plaintiffs' interests under their drilling and operating contracts on the ground that the royalty interests should have been deducted in making those assessments. Those contracts are the Standard contract between plaintiff Standard Oil Company and the Los Angeles County Flood Control District; the Termo contract between plaintiff Termo Company and the Board of Harbor Commissioners of the City of Long Beach, and the Humble contract between plaintiff Humble Oil

& Refining Company and the Board of Harbor Commissioners of the City of Long Beach. The trial court concluded that each contract created a tenancy in common between the parties in the respective taxable mineral interests, and that plaintiffs were therefore erroneously taxed for property owned in part by tax exempt entities.

1. *The Standard contract.* Plaintiff Standard Oil Company is the successor in interest of Continental Corporation, which entered into the Standard contract in 1939 for "twenty (20) years . . . and so long thereafter as oil, gas and/or other hydrocarbon substances is or are produced from said lands in paying quantities." The instrument refers to plaintiff as "contractor," and the preamble states that the Los Angeles County Flood Control District "desires to employ and engage contractor to drill, develop and operate" for the recovery of hydrocarbons. Plaintiff agrees to drill and operate a minimum of eight wells on sites it selects, and such additional wells as in its judgment will properly drain the land. Plaintiff has the exclusive right to drill for and produce oil, gas, and other hydrocarbons, and the exclusive right to enter the land for such purposes and for construction and maintenance of necessary equipment and structures. Plaintiff may terminate drilling operations on all or any part of the premises, subject only to termination of its rights respecting that portion of the premises. It controls production, and may comply with any regulation affecting production when, in its judgment, such action is in the best interests of both parties. It is authorized to incur a variety of expenses incident to the accomplishment of the purposes of the agreement, but such expenses are subject to reimbursement only from the proceeds of the sale of production. It promises not to permit liens against the premises and agrees to hold the district harmless if any are filed, and it must provide liability and fire insurance. It has the right to take part in any litigation. All hydrocarbons produced are the property of the district until sold by it, and the parties specifically note their intent to withhold from plaintiff any interest in the hydrocarbon products or the land.[14] Plaintiff, however, has the exclusive right and obligation to buy all the production from the district, at

[14]"All oil, gas, and other hydrocarbons in, under or from the said properties whether in place in the ground, in storage, or otherwise, shall be and remain the property of District at all times until sold or otherwise disposed of by or for it; it being the particular intent of the parties

which time title passes to plaintiff. After deducting expenses from the proceeds of sales, plaintiff agrees to pay the district a percentage of production as set forth in an attached schedule, ''and shall retain the then balance as and for compensation for its services. . . .''

The Standard contract does not create a tenancy in common in the taxable mineral interest in real property. ▇ As noted above, the taxable mineral interest consists of the right to drill for and produce hydrocarbons. A tenancy in common in that interest in real property exists only if both tenants have a unity of possession in the same estate (*Meyer* v. *Superior Court* (1927) 200 Cal. 776, 792 [254 P. 1108] ; *Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637, 655), and the intention to create such unity of possession must clearly appear. (*La Laguna Ranch Co.* v. *Dodge, supra,* 18 Cal.2d 132, 138.) ▇ When a landowner conveys to another the exclusive right to drill for and produce hydrocarbons in return for some part of the production or its cash equivalent, he does not thereby become a tenant in common in the *profit a prendre,* for he has not indicated an intention to retain the right to take part in the extraction of hydrocarbons. The Standard contract grants plaintiff the exclusive right to drill for and produce oil and gas and nowhere indicates that the district intended to grant plaintiff less than the full *profit a prendre.* ▇ An agreement to share or retain title to the oil and gas when reduced to possession does not constitute an agreement to share the taxable mineral interest in the real property.[15] ▇ The facts that the instrument is labelled a drilling and operating agreement rather than a lease, that plaintiff is labelled a contractor who is to be paid for services performed, and that the parties disclaim any intent to grant

hereto that nothing in this agreement shall be construed to give to Contractor, and that Contractor shall not under or by virtue of this agreement acquire, any interest in said lands nor in the oil, gas or other hydrocarbons produced therefrom.''

[15]The Standard contract was the subject of litigation in *County of Los Angeles* v. *Continental Corp.* (1952) 113 Cal.App.2d 207 [248 P.2d 157]. The court there rejected the argument that the title retention clause evidenced an intent to relegate the contractor to the position of an agent. '' 'Nor is it of any consequence that here the agreement undertakes to provide that title to the products produced by the defendant shall remain in the district until paid for by it. When considered in the light of the provision that the defendant alone may purchase such products and it is obligated so to do, this provision . . . would seem to be nothing more than a method or device designed to secure payment to the district of the royalty or rental herein reserved to it.' '' (P. 227.)

an interest in property, do not control the legal effect of the instrument.[16] Accordingly, the trial court erred in holding invalid the assessments of plaintiff's interests under the Standard contract.

2. *The Termo and Humble Contracts.* Plaintiff Termo Company entered into a drilling and operating agreement with the Board of Harbor Commissioners of the City of Long Beach in 1939 to drill a well to drain land adjacent to that included in a 1938 oil and gas permit. The parties combined all previous agreements in an amended drilling and operating agreement in 1961. The purpose of the 1961 amendment was to enable the parties to commit the land, located within that segment of the Wilmington Oil Field designated as Fault Block IV, to agreements with other holders of oil and gas interests whereby the entire Fault Block would be operated as one geological unit by a single common agent.[17] The amended agreement became effective when the parties entered into a Unit Agreement and a Unit Operating Agreement with other parties.

Plaintiff Humble Oil & Refining Company is the successor in interest to Westgate-Greenland Oil Company, which entered into an oil and gas permit with the board in 1938 and a drilling and operating agreement with the board in 1939, and General American Oil Company of Texas, which entered into an amended drilling and operating contract in 1961 in contemplation of the commitment of the land to the Fault Block IV agreements. Humble subsequently signed the Unit Agreement and Unit Operating Agreement.

The 1939 Termo drilling and operating agreement contains many provisions similar to those in the Standard contract. The agreement states that the city, having previously granted

---

[16]In *County of Los Angeles* v. *Continental Corp.*, *supra*, 113 Cal.App.2d 207, 226, the court stated: " '. . . While denominated by the parties as a "drilling and operating agreement" rather than as a lease, this is of no particular significance, for it is elementary that the designation which the parties to an agreement see fit to affix to it is not controlling as to its legal effect. (*Hammond Lbr. Co.* v. *County of Los Angeles,* 104 Cal.App. 235, 240 [285 P. 896].) Disregarding mere form, certain it is that it vests in the defendant the exclusive right, for a term of years, "to drill for and produce oil and other substances" from beneath the surface of the land therein described. In this aspect at least it differs in no respect from the usual oil and gas lease and the court concludes that it is substantially the equivalent thereof.' "

[17]Unit operation was required to repressurize the land within the Fault Block by water injection in order to arrest or ameliorate land subsidence, and to increase the maximum economic quantity of hydrocarbons ultimately recoverable by ending wasteful competitive drilling practices. (See Pub. Resources Code, §§ 3315-3347.)

Termo the exclusive right to drill for and produce hydrocarbons, now employs Termo as an independent contractor to drill and operate another well for a 25-year term. The parties disclaim any intention of engaging Termo as anything but a "contractor," or of granting Termo any interest in the land or hydrocarbons produced. The city retains title to hydrocarbons until they are sold. Termo agrees either to provide a purchaser for or to purchase itself all of the production. As compensation for its services, the city agrees to pay Termo 40 percent of the consideration paid by purchasers of the hydrocarbons produced. The city's liability for payment ceases, however, when it authorizes the purchaser to pay Termo, and all expenses of production are to be borne by Termo. Provisions follow dealing with written consent for assignment of Termo's rights, mechanic's liens, workmen's compensation, insurance, and notice of litigation.

The 1939 agreement also contains several provisions that are not included in the Standard contract. Termo agrees to complete the original or any substitute well within 120 days of the commencement of drilling operations unless the city gives written authorization for the continuance of operations. The city may determine whether further drilling would be unsuccessful and unproductive at the drillsite, and if it so finds, may give written consent to the complete abandonment of drilling operations without any requirement that a substitute well be drilled. In the event of possible drainage, the city may order Termo to open or perforate a well so as to produce from additional zones, or to drill additional wells. The city may prevent Termo from placing a casing into the bore-hole of any well if it determines that such casing does not conform to its specifications or if it disapproves of Termo's proposed cementing and perforating program, and may submit the issue to arbitration if no agreement is reached. The city may assume control in extinguishing fires and controlling oil well blowouts. Finally, Termo cannot alter the casing or producing zone without the city's advance written consent.

The 1961 amendment to the Termo drilling and operating contract extends the previous contracts for 25 years. The amendment recites that the city has heretofore granted Termo the exclusive right to drill for and produce hydrocarbons from beneath specified lands, and that it is not feasible for Termo to enter into Fault Block IV unit agreements without first amending and modifying previous agreements. The

amendment states, among other provisions not relevant here: "4. EFFECT OF UNITIZATION. Said Contracts are hereby modified and amended to the extent necessary to make Said Contracts conform to all of the terms and conditions of Fault Block IV United Agreements. 5. UNIT PARTICIPATION. All present interests under Said Contracts are converted to a working interest basis. City's interest under Said Contracts is converted into sixty-five percent (65%) of the working interest in one hundred percent (100%) of the production of oil, gas and other hydrocarbons allocated to Said Lands located in Fault Block IV, and Contractors' interest under Said Contracts is converted into thirty-five percent (35%) of the working interest in one hundred percent (100%) of the production of oil, gas and other hydrocarbons allocated to Said Lands located in Fault Block IV."[18]

The 1961 Humble amended drilling and operating contract integrates all previous contracts between Humble and the city. It contains provisions substantially similar to the provisions of the 1961 amendment to the Termo drilling and operating agreement and to those provisions of the 1939 Termo agreement that resemble the provisions of the Standard contract.[19] In addition, the city's written approval of proposed drillsites selected by Humble is required. In conducting operations for the joint account of the parties, Humble may only make such surveys and tests, and land and place such well casing, as both parties agree upon. No well may be drilled, redrilled, reworked, plugged back, deepened, or altered without the consent of both parties. After Humble's refusal to join in any such operation, however, the city may do such

---

[18]The recital to the amended contract also states: "It is the desire of the parties that City's present interest under Said Contracts will be converted into sixty-five percent (65%) of the working interest in one hundred percent (100%) of the working interest in Said Lands, and Contractor's interest under Said Contracts will be converted into thirty-five percent (35%) of the working interest in one hundred percent (100%) of the working interest in Said Lands and Contractors will advance City's sixty-five percent (65%) of the expenses as a working interest owner and will be reimbursed therefor out of one hundred percent (100%) of the production of oil, gas and other hydrocarbon substances allocated to Said Lands. . . ."

[19]Some minor differences should be noted. Humble agrees to drill and operate fourteen wells and such additional wells as are authorized. The city retains title to hydrocarbons underlying the land until recovered, subject to Humble's exclusive right to drill for, produce, and take the same, and to the city's rights of ownership when produced. As compensation for its services, Humble receives 35 percent of production; 65 percent of Humble's expenses are payable out of the city's share of production.

work at its own expense. Humble has similar rights to drill or conduct other major operations without the city's consent, but only if fewer than 14 wells are open to production. If either party contends that a redrilling or other major operation will jeopardize existing production, the matter may be submitted to arbitration. No well may be plugged or abandoned without the consent of both parties. Equipment, personal property, and fixtures are owned jointly by the parties, 65 percent by the city and 35 percent by Humble, and Humble cannot sell or dispose of such items without the city's prior written consent.

The Unit Agreement signed in 1961 by the city, plaintiffs, and other parties defines ''working interest'' to mean ''any interest, . . . held in lands by virtue of fee title, including lands held in trust, or by virtue of any lease, operating agreement or otherwise, under or pursuant to which the owner of such interest has the right to drill for, develop and produce oil and gas. For the purposes of this agreement a Working Interest shall be deemed to be vested in the owner thereof even though his right to drill or produce may be delegated to a Field Contractor, or an operator under a drilling and operating agreement . . . or other type of agreement.'' Section 4.3 of the Unit Agreement provides that ''Working Interest Owners through the Unit Coordinator or the Unit Operators shall have the right to conduct such operations as they may from time to time Approve as necessary or desirable to produce efficiently and economically the Unitized Substances, to increase the ultimate recovery of Unitized Substances, to prevent waste, or to contribute to the possible arrest or amelioration of Subsidence, including but not limited to Repressuring Operations in and with respect to the Unitized Formations. . . .''[20] The powers of the Unit Operator as set forth in the Unit Agreement and the Unit Operating Agreement include

[20]Section 8.2 of the Unit Agreement further provides that, except for the right to erect noninterfering facilities for taking oil in kind, ''. . . no Person other than the Working Interest Owners, acting through the Unit Coordinator and Unit Operators, shall have any right by reason of this agreement or the Unit Operating Agreement to conduct any operations or install any facilities on any Committed Tract. . . .'' Section 4.1 of the Unit Operating Agreement provides: ''The Working Interest Owners shall exercise over-all supervision and control of all matters pertaining to the repressuring, development and operation [of the unitized lands] . . . and shall make such Determinations and grant such Approvals as they may deem appropriate for the supervision and direction of the Unit Coordinator and the Unit Operators.''

"the exclusive right to develop and operate the Unit Segment designated for it in the Unit Operating Agreement in accordance with the provisions thereof," the right "to enter into such agreements as are desirable or necessary to carry out the purposes" of the Unit Agreement,[21] and the right, subject to approval of the working interest owners, to "employ its own tools and equipment in the drilling or redrilling of Unit Wells. . . ." Matters to be voted on by working interest owners include all aspects of exploration, development, and production.[22] The prescribed voting procedure gives each working interest owner a voting interest equal to its percentage interest in the entire tract committed to unit operations.

Most of the provisions of the 1939 Termo drilling and operating agreement are substantially similar to the provisions of the Standard contract, and do not indicate any intent to create a tenancy in common in the taxable mineral interest.[23] Amicus curiae contends, however, that the provisions of the 1939 Termo agreement that are not contained in the Standard contract and the provisions of the 1961 Humble agreement that are not contained in the Standard contract and that do not relate to unitization indicate a sharing of responsibilities for exploration, development, and production even prior to unitization. Amicus Curiae further contends that the provisions and agreements relating to unitization demonstrate an intent to create tenancies in common in the taxable mineral interest.

We do not agree that the provisions of the Termo agreement and the Humble agreement that do not relate to unitiza-

---

[21]The Unit Operator may enter agreements to repressure or maintain pressures within the unitized formations, to prevent oil or gas migration, to prevent drainage or waste, and "to permit the use of any lands or facilities for oil and gas operations by or in conjunction with any other Persons," as well as for other purposes.

[22]The matters to be approved or determined by the working interest owners include the kind, character and method of unit operations and rate of production; the type, method, and length of repressuring operations; any expenditure over $20,000; the drilling, repair, abandonment, or alteration of any unit well; and the negotiation, execution, and performance of agreements necessary or desirable for the performance of the Unit Agreement.

[23]Amicus curiae contends that the provisions for purchase or sale of the oil and gas produced and the express retention of title to such hydrocarbons by the city show clear intention to create a tenancy in common in the taxable mineral interest because the city retains rights normally granted to a lessee. The rights to hydrocarbons when produced that are retained by the city, however, do not detract from the taxable mineral estate, namely, the exclusive right to drill for and produce hydrocarbons from beneath the surface of public lands for a term of years.

tion indicate an intention to create tenancies in common in the taxable mineral interests. They indicate instead an intention to grant plaintiffs a *profit a prendre* subject to conditions and controls retained by the city to assure that publicly owned oil resources are developed in a manner that will best serve the public interest. The taxable mineral interest consists of the right to drill for and produce hydrocarbons. The instruments grant that interest exclusively to plaintiffs for a 25-year period, with a reversion thereafter to the city. Although the controls retained by the city allow it to supervise operations for its own protection, they do not allow it to undertake such operations itself.[24] Retention of operational checks adequate to assure maximum public benefit from private development of public resources is common. We note, for example, that the California Public Resources Code requires the state to include similar provisions in state oil and gas leases. (See Pub. Resources Code, §§ 6829, 6830.) Such controls serve not only to maximize return to the public, but also to assure that public land leased to private individuals will continue to serve a public purpose. (See, e.g., Health & Saf. Code, §§ 33336, 33439; *City & County of San Francisco* v. *Ross* (1955) 44 Cal.2d 52, 57-58 [279 P.2d 529]; *Ventura Port Dist.* v. *Taxpayers etc. Ventura Port Dist.* (1959) 53 Cal. 2d 227, 234-235 [1 Cal.Rptr. 169, 347 P.2d 305].)

We conclude, however, that the unit agreements and the provisions of the 1961 instruments that refer to unitization create tenancies in common in the respective taxable mineral interests in land. By those instruments and provisions the city adjusted its relationship with each of the plaintiffs involved so that the previously granted exclusive rights to drill for and produce oil and gas would be delegated to a common agent. That agent's operations are subject to control by vote of "working interest" owners, both the city and the

---

[24]Paragraph 7 of the Humble contract provides that if Humble refuses to drill, redrill, rework, deepen, plug back, or alter a well, the city may carry out the operation at its own expense. If the city elects to drill a well, Humble agrees to operate the well, and to surrender its share of the hydrocarbons produced until its share of drilling expenses has been recovered. Provisions for redrilling and other operations include the right to arbitration if either party feels that the source of supply from which the well is then producing will be shut off or jeopardized. Considered in the context of the entire contract, the provisions of paragraph 7 merely provide another control provision in the event that Humble fails to meet its obligation to maximize production from the tract, and are not meant to create a tenancy in common in the taxable mineral interest.

plaintiff involved are working interest owners, and both vote in proportion to their adjusted interests and their relative interests in the entire tract committed to unit operation. The right to drill for and produce oil and gas, which comprises the taxable mineral interest, is no longer held exclusively by a single oil contractor. Rather, both the plaintiff involved and the city control the drilling and production of oil and gas on the subject land in proportion to their voting rights in the unit, and each has subscribed to that unity of possession required to create a tenancy in common in the taxable mineral estate.

Defendants contend, however, that as between the city and each of the plaintiffs involved, the plaintiff continued to own the entire *profit a prendre,* and that it is only for unit purposes that each party votes in proportion to its unit participation. Defendants urge that the purpose of unitization is to prevent subsidence and that the voting arrangements created by the unit agreements were intended to give the city a voice within the unit only to protect the public interest in the carrying out of the unitization program. Defendants conclude that unitization should not affect the taxable property interests of the parties. Although some provisions of the unit agreements indicate the wish of the parties to avoid tax consequences, to achieve unitization they agreed to share full control over the right to drill for and produce hydrocarbons, the right that comprises the taxable mineral estate. Accordingly, the trial court correctly concluded that the city became a tenant in common with Termo and Humble and that the latters' interests should be assessed accordingly.

The part of the judgment in L.A. 29534 dealing with the assessments of interests under the Standard contract is reversed and the trial court is directed to amend its findings of fact and conclusions of law in accord with the views expressed herein and to enter judgment for defendants as to those assessments. In all other respects the judgment in L.A. 29534 is affirmed. The judgment in L.A. 29535 is affirmed. Defendants shall recover their costs on these appeals.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

The petition of the plaintiffs and appellants for a rehearing was denied December 18, 1968.