[No. F016864. Fifth Dist. July 12, 1993.]

ORYX ENERGY COMPANY, Plaintiff and Respondent, v.
COUNTY OF KERN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of subpart B. of part I.

## COUNSEL

B. C. Barmann, County Counsel, and John M. Gallagher, Chief Deputy County Counsel, for Defendant and Appellant.

Hanna & Morton, Edward S. Renwick and Allison L. Malin for Plaintiff and Respondent.

## OPINION

**ARDAIZ, J.**—Oryx Energy Company (hereinafter Oryx) was the lessee and the United States of America was the lessor of three mineral leases during the tax years 1983-1984, 1985-1986 and 1986-1987.[1] The leases granted to Oryx the right to take oil and gas from the federally owned land, and required Oryx to pay to the United States government a rent or "royalty" of approximately 13 percent of the value of the gross production obtained from each leasehold. The Oryx leaseholds were subject to a property tax levied by

---

[1]Each tax year ran from July 1 through the following June 30. During these three tax years, Oryx was known as Sun Exploration and Production Company. The company changed its name to Oryx Energy Company in May of 1989.

the County of Kern (hereinafter the County). The County would assess the value of the taxable property and then tax the property in an amount equal to a specified percentage of the assessed value. The specified percentage, or tax rate, would vary from year-to-year, but for each of the three years in question it was approximately 1 percent.

Oryx applied to the County Assessment Appeals Board for a change in the values at which the Oryx leaseholds had been assessed, but the board refused to reduce those assessed values. Oryx paid the taxes and filed claims with the County for what Oryx contended were overpayments of its tax. The County would not issue a refund, and Oryx filed suit against the County to recover the amounts allegedly overpaid. The trial court ruled, after a nonjury trial, that the County had improperly overvalued the leaseholds and that Oryx had overpaid its tax by $1,318,892.40. The court's judgment also required the County to pay interest on the Oryx overpayment from the dates on which Oryx filed its claims for refunds, and thus the judgment totaled more than $1.8 million.[2]

## CONTENTIONS ON APPEAL

The County has appealed and contends that the Oryx leaseholds were properly valued and that Oryx is not entitled to a refund. Oryx has filed a cross-appeal and contends that the court properly determined that Oryx was entitled to a refund but improperly determined that interest on the tax overpayments may only be awarded as of the dates on which Oryx filed its claims for refunds. Oryx contends that it should be awarded interest not from the date of its filing of its refund claims but from the earlier dates on which it actually paid the taxes. For reasons stated, *post*, we conclude the leaseholds are properly valued and reverse the judgment. Therefore, we will not address the Oryx claim concerning interest.

## I.

### THE COUNTY'S APPEAL—REVENUE AND TAXATION CODE SECTION 107.2

#### A. *The Dispute*

The dispute between Oryx and the County over the values at which the Oryx leaseholds were assessed can be simply stated. Oryx contends that the

[2]The judgment ordered that the County pay Oryx $1,318,892.40 representing overpaid taxes, plus $473,172.79 in prejudgment interest accrued through August 31, 1991, plus $325.20 per day in prejudgment interest until the entry of judgment. Judgment was entered on October 1, 1991.

value of each leasehold should be reduced by an amount equal to the present value of royalties Oryx paid to the lessor, the United States. Oryx and the County have denominated this present value of the royalties Oryx paid to the United States as the "government royalty interest" or "GRI." We will use the same terminology. The County contends that the value of each Oryx leasehold should not be reduced by the amount of the government royalty interest. Oryx and the County agree that if the government royalty interest was properly included in the value at which each leasehold was assessed, then the tax assessed by the County was correct. They also agree that if the government royalty interest was improperly included in the assessed valuation of each leasehold, then Oryx overpaid its tax by $1,318,892.40. Furthermore, this case does not involve any question of whether the inclusion of a government royalty interest in the valuation of an oil and gas leasehold is a legally appropriate method, from an accounting standpoint, by which to assess the value of such a leasehold. Both sides agree that it is. (See *Atlantic Oil Co.* v. *County of Los Angeles* (1968) 69 Cal.2d 585, 599 [72 Cal.Rptr. 886, 446 P.2d 1006].) ▮▮▮ At issue here is whether Revenue and Taxation Code section 107.2 required the County to reduce the value of the Oryx leaseholds by the value of government royalty interest paid by Oryx to the United States. The County contends the statute did not require such a reduction. Oryx contends that the statute did require such a reduction, and the trial court agreed.

B. *The Role of the Superior Court**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *Revenue and Taxation Code Section 107.2*

This case involves a dispute over the meaning of Revenue and Taxation Code section 107.2. That section states:

"The full cash value of leasehold estates in exempt property for the production of gas, petroleum and other hydrocarbon substances from beneath the surface of the earth, and all other taxable rights to produce gas, petroleum and other hydrocarbon substances from exempt property (all of which rights are hereinafter in this section referred to as 'such oil and gas interests'), is the value of such oil and gas interests exclusive of the value of any royalties or other rights to share in production from exempt property owned by any tax-exempt entity, whether receivable in money or property and whether measured by or based upon production of income or both.

"This section applies to such oil and gas interests created prior to the date on which the decision in De Luz Homes, Inc. v County of San Diego (1955)

---

*See footnote, *ante*, page 48.

45 Cal.2d 546 [290 P.2d 544], became final. This section does not, however, apply to any of such oil and gas interests created prior to such date which have been after such date or are hereafter extended or renewed, unless such extension or renewal is pursuant to authority in a contract, lease, statute, regulation, city charter, ordinance, or other source, which authority permits no reduction of the rate of royalty or other right to share in production on grounds of an increase in the assessed valuation of such oil and gas interest. Moreover, this section does not apply to any of such oil and gas interests if the rate of royalties or other right to share in production has, prior to the effective date of this section, been reduced to adjust for the fact that certain assessors have valued such oil and gas interests without excluding the value of said royalties or other rights to share in production."

In order to address the statutory interpretation of Revenue and Taxation Code section 107.2, it is necessary to examine the historical lineage of the statute. In *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546 [290 P.2d 544], the California Supreme Court held that the proper method to assess the value of a possessory interest created by a lease on the property of a tax-exempt governmental entity was to calculate the full cash value of the possessory interest without deducting from that value the rent paid for the leasehold. Previously, in *Blinn Lbr. Co.* v. *County of Los Angeles* (1932) 216 Cal. 468 [14 P.2d 516], the court had approved of a valuation method which allowed a deduction of the rent paid for such a lease in computing the value of the lease for property tax purposes. An immediate consequence of *De Luz* was its impact on existing leases where lessees had assumed the *Blinn* valuation method in entering into lease agreements. Simply put, business decisions which had relied on one method of valuation became erroneous. However, leases predicated on reliance on *Blinn* now were subject to unanticipated additional taxes. The Legislature responded with Revenue and Taxation Code section 107.1:

"The full cash value of a possessory interest, when arising out of a lease of exempt property, is the excess, if any, of the value of the lease on the open market, as determined by the formula contained in the case of De Luz Homes, Inc. v County of San Diego (1955), 45 Cal.2d 546 [290 P.2d 544], over the present worth of the rentals under said lease for the unexpired term thereof.

"A possessory interest taxable under the provisions of this section shall be assessed to the lessee on the same basis or percentage of valuation employed as to other tangible property on the same roll.

"This section applies only to possessory interests created prior to the date on which the decision of the California Supreme Court in De Luz Homes,

Inc. v. County of San Diego (1955), 45 Cal.2d 546 [290 P.2d 544], became final. It does not, however, apply to any of such interests created prior to that date that thereafter have been, or may hereafter be, extended or renewed, irrespective of whether the renewal or extension is provided for in the instrument creating the interest.

"This section does not apply to leasehold estates for the production of gas, petroleum and other hydrocarbon substances from beneath the surface of the earth, and other rights relating to such substances which constitute incorporeal hereditaments or profits a prendre."

In rejecting a challenge to Revenue and Taxation Code section 107.1, the Supreme Court focused in part on the genesis of section 107.1. "Private lessees of government property under leases made prior to the De Luz decision complained that it was inequitable to apply the De Luz rule to them, since their rentals were fixed on the assumption that the rental value of the property would not be taxed." (*Forster Shipbldg. Co.* v. *County of L.A.* (1960) 54 Cal.2d 450, 453 [6 Cal.Rptr. 24, 353 P.2d 736].)

The Supreme Court further noted "Section 107.1 partially reinstates the rule of the Blinn case as the method for assessing and taxing interests created in reliance on that rule, while preserving the rule of the De Luz case for all other interests. The sole purpose of the section is to mitigate the economic burdens imposed on lessees of tax-exempt property when this court overruled the Blinn case." (54 Cal.2d at p. 458.)

*De Luz* involved ordinary surface leases. After *De Luz*, there was growing uncertainty as to whether *De Luz* should be applied to oil and gas leases. Assessors still permitted a deduction for royalties paid on oil and gas leases, but in 1963 began to change this practice and to no longer permit a deduction for royalties paid. Eventually, the application of the *De Luz* valuation method to oil and gas leases was determined to be correct in *Atlantic Oil Co.* v. *County of Los Angeles, supra.*

*Atlantic Oil* was decided on November 18, 1968. But in 1967, while the case was still pending, the Legislature enacted Revenue and Taxation Code sections 107.2 and 107.3.[3] The Legislature announced its purpose for enacting sections 107.2 and 107.3 in section 4 of Statutes of 1967, chapter 1684,

---

[3]Revenue and Taxation Code section 107.3 is similar to Revenue and Taxation Code section 107.2 except that it pertains to oil and gas interests created after the December 1955 finality of *De Luz* and on or before July 26, 1963. It thus appears to extend the applicability of the *Blinn* valuation method to oil and gas interests created during this seven-and-a-half-year period. July 26, 1963, was the date on which certain proposed legislation seeking to expressly preserve *Blinn* valuation of oil and gas leaseholds was vetoed by Governor Edmund

page 4219, where it stated: "The Legislature finds and declares that prior to 1963 all assessors in California uniformly excluded or deducted the value of government-owned royalty or similar interests when assessing privately owned oil and gas interests in government lands. In 1963 certain assessors reversed this longstanding uniform method of assessment and such oil and gas interests are now generally assessed without such exclusion or deduction. This unexpected change has resulted in severe hardship similar to the hardship suffered by lessees of the surface of government land as a result of the decision in De Luz Homes, Inc. v. County of San Diego (1955) 45 Cal.2d 546 [290 P.2d 544]. In 1957 the Legislature relieved the surface lessees from such hardship by the enactment of § 107.1 of the Revenue and Taxation Code, but excluded oil and gas interests from such relief because the Legislature, consistent with the understanding of the oil industry, the state and the assessors, believed that the rule of the De Luz Homes case was not applicable to oil and gas interests. Now that assessors have changed their prior method of assessment, the Legislature finds, declares and intends that similar relief should be extended to oil and gas interests by this act."

 Therefore, we conclude that as acknowledged by the Legislature the sole purpose of Revenue and Taxation Code section 107.2 was as expressed in *Forster* regarding Revenue and Taxation Code section 107.1, "to mitigate

---

G. Brown. The leases involved here were created prior to the December 26, 1955, finality of *De Luz* and were renewed after *De Luz* and after July 26, 1963. (See fn. 4, *post*.) Section 107.3 states:

"The full cash value of leasehold estates in exempt property for the production of gas, petroleum and other hydrocarbon substances from beneath the surface of the earth and all other taxable rights to produce gas, petroleum and other hydrocarbon substances from exempt property (all of which rights are hereinafter in this section referred to as 'such oil and gas interests'), is the value of such oil and gas interests, exclusive of the value of any royalties or other rights to share in production from exempt property owned by any tax-exempt entity, whether receivable in money or property and whether measured by or based upon production or income or both.

"This section applies to:

"(a) Such oil and gas interests created prior to the date on which the decision in De Luz Homes, Inc. v County of San Diego (1955) 45 Cal.2d 546 [290 P.2d 544], became final to which Section 107.2 of this code does not apply because said interests were extended or renewed on or before July 26, 1963.

"(b) Such oil and gas interests created on or after the date on which said decision became final and on or before July 26, 1963.

"This section does not, however, apply to any of such oil and gas interests extended or renewed after July 26, 1963, unless such extension or renewal is pursuant to authority in a contract, lease, statute, regulation, city charter, ordinance or other source which authority permits no reduction of the rate of royalty or other right to share in production upon the ground of an increase in the assessed valuation of such oil and gas interest. Moreover, this section does not apply to any of such oil and gas interests if the rate of royalties or other right to share in production has, prior to the effective date of this section, been reduced to adjust for the fact that certain assessors have valued such oil and gas interests without excluding the value of said royalties or other rights to share in production."

the economic burdens imposed on lessees of tax-exempt property when the court overruled the Blinn case." (*Forster Shipbldg. Co.* v. *County of L.A.*, *supra*, 54 Cal.2d at p. 458.) Like the lessors referred to in *Forster*, it is reasonable to conclude that their rentals were fixed on the assumption the royalty paid would not be taxed but deducted. Thus, the hardship would be the imposition of an unanticipated tax burden where the lease terms obligated the lessor to a royalty payment negotiated on the assumption of the *Blinn* method of taxation.

## STATUTORY INTERPRETATION

With regard to the first paragraph of Revenue and Taxation Code section 107.2, the parties agree that the phrase "the value of any royalties" means, in the context of this case, the agreed-upon value of the government royalty interest paid by Oryx to the United States for each lease. Oryx and the County also agree that the owner of the leased land, the United States, is a "tax-exempt entity." With regard to the second paragraph of the statute, Oryx and the County agree that "the date on which the decision in De Luz Homes, Inc. v County of San Diego (1955) 45 Cal.2d 546 [290 P.2d 544], became final" was December 26, 1955. They agree that each Oryx lease involved here was "created prior to" December 26, 1955, and that each lease was "extended or renewed" after that date. ▮▮▮ What the parties disagree about is whether each "such extension or renewal is pursuant to authority . . . which . . . permits no reduction of the rate of royalty . . . on grounds of an increase in the assessed valuation of" each renewed leasehold. Oryx contends that each lease in issue here was renewed pursuant to authority which "permits no reduction of the rate of royalty . . . on grounds of an increase in the assessed valuation of" each leasehold, and that therefore the value of the government royalty interest paid by Oryx should have been excluded from the assessed value of each leasehold. The trial court agreed. The County contends that each of the Oryx leases was renewed pursuant to authority which does permit a "reduction of the rate of royalty . . . on grounds of an increase in the assessed valuation of" each leasehold. Therefore, the County argues the value of the government royalty interest paid by Oryx should not have been excluded from the assessed value of each lease. The County concludes the trial court therefore erred in ruling that the $1,318,892.40 paid by Oryx as a tax on the value of the government royalty interest should be refunded.

In effect, both parties argue their interpretation of the term "authority" as it is used in Revenue and Taxation Code section 107.2 resolves the question in their favor as to whether the leases in question fall within the *De Luz* exemption of section 107.2. What constitutes "authority" and what that

"authority" requires lends itself to a number of possible interpretations. In order to evaluate the relative merits of either position, we must first determine what the statute requires in order to be applicable. Necessarily, this involves an interpretation of the statute in question. ■ As noted in *People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154], "Our analysis [of the construction of a statute] starts from the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] In determining intent, we look first to the words themselves. [Citations.] When the language is clear and unambiguous, there is no need for construction. [Citations.] When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]"

As the court noted in *Woodhead,* the issue in this case turns on two things—the direct language of the statute and the statutory intent. In other words, what did the Legislature say and what was it they intended to accomplish? We have already addressed their intent. The Legislature was concerned about lessees who were committed to leases that held them to legal obligations to pay set amounts, rents or royalties, but imposed unanticipated costs because of a court decision that changed long-standing tax practices. This is particularly illustrated in Revenue and Taxation Code section 107.1 which was the first response to *De Luz.* Section 107.1 again provides in pertinent part: "This section applies only to possessory interests created prior to the date on which the decision of the California Supreme Court in De Luz Homes, Inc. v County of San Diego (1955) 45 Cal.2d 546 [290 P.2d 544], became final. It does not, however, apply to any of such interests created prior to that date that thereafter have been, or may hereafter be, extended or renewed, *irrespective of whether the renewal or extension is provided for in the instrument creating the interest.*" (Italics added.) Thus, the Legislature by the terms of section 107.1 cut off relief from the *De Luz* decision when the pre-*De Luz* lease expired. It should be noted that even if the lessor could have or would have anticipated renewal or extension of the lease, there was no statutory relief provided. In other words, the Legislature concluded the relief provided by the statute was sufficient and the lessee need not renew or extend the lease if the lessee did not wish to maintain the lease amount under the application of *De Luz.* Realistically, the Legislature sought to relieve the unanticipated burden—not to create a windfall by exempting parties in perpetuity from full value taxation.

When assessors taxed oil and gas leases under *De Luz,* the Legislature could have simply reapplied the language of Revenue and Taxation Code

section 107.1 to oil and gas leases of exempt property. However, the Legislature responded with Revenue and Taxation Code section 107.2, which included an express statement of intent to alleviate the hardship similar to that addressed by section 107.1 and virtually identical language—with an additional clause. It is this clause which is the focus of the instant case. "This section applies to such oil and gas interests created prior to the date on which the decision in De Luz Homes, Inc. v County of San Diego (1955) 45 Cal.2d 546 [290 P.2d 544], became final. This section does not, however, apply to any of such oil and gas interests created prior to such date which have been after such date or are hereafter extended or renewed, *unless such extension or renewal is pursuant to authority in a contract, lease, statute, regulation, city charter, ordinance, or other source, which authority permits no reduction of the rate of royalty or other right to share in production on grounds of an increase in the assessed valuation of such oil and gas interest[s]*. Moreover, this section does not apply to any of such oil and gas interests if the rate of royalties or other right to share in production has, prior to the effective date of this section, been reduced to adjust for the fact that certain assessors have valued such oil and gas interests without excluding the value of said royalties or other rights to share in production." (Rev. & Tax. Code, § 107.2, italics added.)

The additional clause creates an ambiguity as to the nature and source of the "authority" which authorizes the extension or renewal. Several conceivable interpretations arise. ■ Under Revenue and Taxation Code section 107.1 there was no relief even if "the renewal or extension [was] provided for in the instrument creating the interest." We construe this language of section 107.1 as precluding relief even in those cases where the pre-*De Luz* lease had a provision for renewal or extension upon which the parties relied. ■ Thus, the question arises, did the Legislature in using the term "authority" in Revenue and Taxation Code section 107.2 intend that the instrument creating the interest be the "authority"? In other words, did the Legislature intend to cut off the *De Luz* exemption for renewals of oil and gas leases of exempt property without regard to the terms of the instrument providing for the renewal or extension? This is what they did to surface leases under section 107.1. Or did the Legislature consider that oil and gas leases which had extension or renewal provisions contractually or statutorily provided may contain clauses which would obligate the lessee to long-term royalty terms during the renewal or extension which never considered the *De Luz* method of taxation? In other words, a lessee may have contemplated securing the ability to extend or renew in order to make long-term business decisions or capital expenditures. It would not be unreasonable for such a lessee to assume the *Blinn* method of taxation would be part of that business decision. Thus, a lessee may have made long-term commitments and accompanying business decisions which he/she could not change even though tax

law changed. On the other hand, one who entered into a lease without any commitment as to the terms of extension or renewal leaves all things negotiable—including reduction in a rate of royalty to adjust for tax assessments. Or, did the Legislature intend that the extension or renewal need not be provided for in the pre-*De Luz* instrument and that the terms of the extension or renewal dictate statutory applicability. In other words, could the parties agree to extend or renew a pre-*De Luz* lease and if the renewed lease did not permit a reduction in royalty would that fall within the *De Luz* exemption?

The statute makes it clear that simply the fact the lease is extended or renewed is not enough to maintain the *De Luz* exemption. The authority which permits extension or renewal must contain specific provisions. We conclude the Legislature intended and did only extend the *De Luz* exemption to a class of lessees who had entered leases with contractual renewal or extension provisions or renewal or extension provisions provided by statute, etc., which denied them the ability to renegotiate in light of *De Luz*. Therefore, we construe the "authority" referred to in Revenue and Taxation Code section 107.2 as being the instrument which created the pre-*De Luz* interest or the statutory authority providing for renewal. This is consistent with the reach of Revenue and Taxation Code section 107.1, which directed itself to extension or renewal provisions in the lease which was existent at the time of *De Luz*. We reach this conclusion for the following reasons.

Revenue and Taxation Code section 107.2 states, ". . . unless such extension or renewal is pursuant to authority in a contract, lease, statute, regulation, city charter, ordinance or other source . . . ." ▮ A statute should be interpreted in accord with the plain meaning of the words if possible. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) First of all, there is a distinction between an extension and a renewal. ▮ "Technically, *renewal* of a lease involves the execution of a new instrument: *extension* is a continuation in possession under the old lease, after notice under its provisions." (4 Witkin, Summary of Cal. Law (9th ed. 1987) § 624, p. 809.) ▮ In any event, neither an extension nor a renewal of this type of property interest is an entitlement unless the original contract so provides. If the original contract contains no provision for renewal or extension, then certainly one could not have relied upon renewal or extension in making any business decision or a long-term capital expenditure which assumed a term longer than provided for in the lease or contract. If the authority to extend or renew is based on a statute or regulation, then the statute, regulation, etc., must address renewal or extension. In other words the statute, etc., must provide words to the effect of "the

lease may be renewed . . . ." We view this interpretation as consistent with the expressed legislative intent to alleviate the hardship of those who may have committed themselves to long-term obligations based on a *Blinn* taxation assumption where they had secured or had been provided statutorily the ability to extend or renew.

However, the Legislature also provided in Revenue and Taxation Code section 107.2, ". . . which authority permits no reduction of the rate of royalty or other right to share in production on grounds of an increase in the assessed valuation of such oil and gas interests." We view this language as referring to the authority which permits the extension or renewal. We conclude that by the terms of the statute, this authority must prohibit a reduction. That it does not provide for a reduction is not enough. Unless the authority which permits extension or renewal obligates the lessee to non-negotiable terms of royalty, then the term is negotiable. Thus, one cannot say the authority does not provide for reduction unless the terms of the royalty are express.

This is consistent with the expressed intent of the Legislature. Where a lessee makes a long-term commitment that provides for or allows for renewal or extension and the terms of the extension are not completely defined, then the lessee can negotiate the terms. Further, in the absence of specific provisions a lessee cannot assume the terms of the extension or renewal will be the same. Thus, only the lessee who has made business decisions wherein it has the right to renew or extend and the terms of the extension or renewal are fixed can complain of the hardship created by *De Luz*. Therefore, a lessee who had a provision to renew wherein there were no fixed royalty terms could not complain about the *De Luz* taxation method simply because the terms of the renewal extended by the lessor make no accommodation in the royalty payment for reduction in royalty to adjust for *De Luz*.

We conclude that neither the statute nor the expressed statutory intent contemplates lessees who have no contractual right to extend or renew but who obtain a renewal or extension by virtue of a new instrument which specifies terms that do not adjust for tax assessments. The short explanation is that such lessees did not have the hardship imposed upon them. Rather, they accepted the consequence of *De Luz* taxation by entering into the new contract.

With respect to extensions or renewals by statute or regulation, unless the statute, etc., provides for renewals then the lessee would have no enforceable right to renew. Further, unless the right to renew provided by the statute was

express in its terms—i.e., there was no basis for negotiating different terms or specific terms other than those provided, the lessee again would not have the hardship imposed on them. Rather, they would be entering a new lease with terms to which they had agreed. If this circumstance could constitute criteria providing a *De Luz* exemption then the parties could effectively create the exemption when they had not relied on the *Blinn* taxation method extending into the new lease. By way of explanation, the exclusion of royalty payments from assessed valuation benefits the lessee by lowering the property tax. However, the exclusion of royalty payments does not have any adverse tax consequence to the lessor. By agreeing to terms of a contract which do not permit a reduction for royalty payments, the lessee gains a benefit taxwise and some relief from demanded royalty payments. Thus, a lessee who had not relied on the *Blinn* taxation method over an anticipated term of a renewable lease could create the same benefit by simply agreeing to the term. Individuals who had entered leases pre-*De Luz* without any renewal options or without royalty reduction provisions on renewal could obtain the *De Luz* exemption even though they had not entered a lease relying on the *Blinn* taxation method continuing during the renewal.

We construe the intended statutory benefit as relief for those caught between contractual reliance and obligations and changed tax laws. We do not construe the intended statutory benefit extending to those who cannot claim reliance but choose to accept a contractual or statutory provision that does not reduce royalties to accommodate property assessments.

Focusing on the contracts at issue here, neither the original leases which were pre-*De Luz* nor any of the subsequent renewal term leases provides an absolute right to renew. Rather, each provided: ". . . with preferential right in lessee to renew this lease for successive periods of ten (10) years, upon such reasonable terms and conditions as may be prescribed by lessor, unless otherwise provided by law at expiration of such periods."

Further, each of the original leases as well as the renewals contained a paragraph "2(d)(4)" which stated: "Rentals or minimum royalties may be waived, suspended, or reduced; and royalties on the entire leasehold or any portion thereof segregated for royalty purposes may be reduced if the Secretary of the Interior finds that, for the purpose of encouraging the greatest ultimate recovery of oil or gas in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated

under the terms fixed herein."[4] Oryx presented the declaration of Delbert Fortner, a representative of the United States Bureau of Land Management, who stated: "If the holder of a federal lease were to inform me that the County had increased the assessed value of his lease, and the lessee requested a reduction of royalty to offset the increase in property taxes, I would tell the lessee that if he wants to request the BLM to lower his royalty, then he must file an application for reduction of royalty. In order to receive a reduction in royalty, the applicant would need to satisfy the requirements described in my December 28, 1990 Declaration, which includes the requirement that the lease be uneconomic (costs exceed revenue) or on the verge of becoming uneconomic." The County contended in the trial court, and contends here on appeal, that title 30, United States Code section 209 is authority which permits a "reduction of the rate of royalty . . . on grounds of an increase in the assessed valuation of" the Oryx leaseholds. That section states in relevant part: "The Secretary of the Interior, for the purpose of encouraging the greatest ultimate recovery of . . . oil, gas . . . , and in the interest of conservation of natural resources, is authorized to waive, suspend, or reduce the rental, or minimum royalty, or reduce the royalty on an entire leasehold, or on any tract or portion thereof segregated for royalty purposes, whenever in his judgment it is necessary to do so in order to promote development, or whenever in his judgment the leases cannot be successfully operated under the terms provided therein. . . ." (Fn. omitted.) The parties stipulated that 30 United States Code section 209 does allow a reduction in royalties paid pursuant to a federal lease if the lease becomes uneconomic. They also agree that the three leases involved here were operated successfully and that they have never been "uneconomic" or on the verge of becoming uneconomic. The trial court rejected the County's contention that section 209 permits a "reduction of the rate of royalty . . . on grounds of an increase in the assessed valuation of" the leasehold. (Rev. & Tax. Code, § 107.2.) The court's statement of decision stated in part: "Defendant argues that the provision of Title 30 section 209 described above in paragraph 23 takes the subject leases out of the scope of Revenue and Taxation Code §§ 107.2 and 107.3 because it permits reduction of the royalty rate on grounds of an increase in the assessed valuation of said leases. This Court disagrees. Said provision permits reduction of the royalty rate on the ground that the subject lease is uneconomic. While one means by which a lease may be rendered uneconomic is by an increase in the assessed valuation of the lease resulting in higher taxes to the extent that the lease cannot generate a

[4]The three leaseholds were known as Maxwell, McKittrick and Hazelton. The Maxwell lease was issued on August 5, 1920, and renewed on February 1 in the years 1948, 1958, 1968 and 1978. The McKittrick lease was issued on August 16, 1920, and renewed on September 1 in the years 1945, 1955 and 1965. The Hazelton lease was issued on December 23, 1929, and renewed on December 1 in the years 1949, 1959, 1969 and 1979.

profit, the relief provision of Title 30 section 209 is not the same as permitting reduction of the royalty rate on grounds of an increase in the assessed valuation of the lease. The ground for relief under Title 30 section 209 is nonprofitability, not increase in assessed valuation."

We do not view these terms in the contracts or 30 United States Code section 209 as precluding or prohibiting a reduction in royalty to adjust for tax assessments. While a federal functionary may not be inclined to reduce royalties because of tax assessments unless the lease is uneconomic does not mean he/she is precluded from doing so. Section 209 by its terms provides broad discretion to the Secretary of the Interior to reduce royalty agreements. We see nothing in the terms of the leases or section 209 which "permits no reduction of the rate of royalty . . . ." In other words, we find nothing in the terms of the lease or section 209 which prohibits "a reduction in royalty . . . on grounds of an increase in the assessed valuation . . . ."

Therefore, even assuming the renewed leases herein or the original pre-*De Luz* leases could be construed as providing authority for extension or renewal, we do not find that authority prohibits a reduction in the rate of royalty because of a *De Luz* taxation formula. Further, the respondent's contention to the contrary raises several serious questions concerning (1) intent of the Legislature and (2) constitutionality. We have noted that the purpose of the statute is to relieve lessees who are locked into terms and have made business decisions accordingly. It is at least understandable that legislative compassion might be extended to such individuals or entities. They have made decisions based on an expected cost, committed themselves financially and legally, and had a taxation change which undermines their original financial judgment. It is evident that such a change might well render a business decision unreasonable or impractical. The key to this quandary is the ability to negotiate terms and to not having relied on terms of renewal that were static. The parties here cannot complain that any of the leases, assuming there was a right to renew, specified lease rates which prohibited accommodation of tax rates. These lessees have arrived some 30 years after *De Luz*. They seek to turn legislative accommodation of a hardship into a legislative endorsement of a windfall. In *Texas Co.* v. *County of Los Angeles* (1959) 52 Cal.2d 55 [338 P.2d 440] the argument was tendered that ". . . since the DeLuz case overruled the Blinn case, it should be given prospective effect only and should not be applied in valuing leaseholds created before it was decided." (*Id.* at p. 64.) The Supreme Court responded: "Although those who acquire property or make contracts in reliance of the existing tax laws may be disappointed in their economic expectations when those laws are changed, they acquire no vested right that such changes shall not be made. Taxes on existing interests are not immutable, for within constitutional limits the Legislature has full freedom to

change them. Surely an erroneous interpretation of a tax statute cannot be more immutable than the statute itself, and if the court failed to give effect to the correction of its own error, it would defeat the legislative purpose not only as to the past but for the indefinite future." (*Ibid.*)

In *Forster*, the court noted that: "Section 107.1 is not an unreasonable exercise of the Legislature's power to mitigate hardships caused by the overruling of established law. Rentals in leases of tax-exempt property created before the De Luz case were fixed at a level competitive with rentals of private property on the assumption that the rental value of the possessory interest would not be taxed. The De Luz case imposed an unexpected tax burden on the lessees that their governmental lessors refused to mitigate by reducing rentals, on the ground that such reductions would constitute unconstitutional gifts of public funds." (*Forster Shipbldg.*, *supra*, 54 Cal.2d at pp. 459-460.)

In *Atlantic Richfield Co.* v. *County of Los Angeles* (1982) 129 Cal.App.3d 287 [180 Cal.Rptr. 901], the court overruled a constitutional challenge to Revenue and Taxation Code section 107.2 concluding that relief from the hardship created by *De Luz* was a constitutional exercise of legislative power. Where the hardship of *De Luz* is no longer a consideration, relief from full value taxation may well constitute an unconstitutional gift of public funds absent some other valid public purpose. We need not decide whether there is another valid public purpose. We need only decide whether respondents were caught in the unanticipated vice of *De Luz*—we conclude they were not. Therefore, we reject the trial court's interpretation of the contracts, leases and regulations herein. We find that respondents herein are not entitled to the legislatively created exemption from hardship provided by section 107.2.

The judgment is reversed. Costs to appellant.

Best, P. J., and Buckley, J., concurred.

A petition for a rehearing was denied August 11, 1993.